117-04-40 McClure v. Rosemont Exposition Services, Inc. Counsel may proceed. Thank you, Your Honor. May it please the Court, I am George Gaines, here today for the plaintiff, John Pecor. Briefly, with respect to the facts, this construction worker, working for the employer for about nine years, fell off of a six-foot ladder, which broke while he was using it, fell in a prone position on the floor, on his outstretched arms and forehead. Could you speak up just a little bit? I'm sorry, yeah. Yeah, this doesn't, it's not per se, well, I guess it does amplify, but it's mainly for recording purposes. Mr. Pecor was working for the respondent, the employer, for nine years when the ladder on which he was working broke, and he fell in a prone position on the floor with his outstretched arms on his arms and on his forehead, and ultimately determined his face as well. He immediately noticed left and right wrist, elbow and left shoulder symptoms, eventually noticed a left eyebrow. Most of his body, as could be imagined, including losing three teeth, more of him was given in the emergency room. He was taken to the emergency room by ambulance. As you can imagine, this was a heavy job that he had been working for quite some time. I think we know pretty much the facts. Let me ask you a couple of pointed questions. Sure, sure. Pone in at what I think are the critical issues. As you know, in this case, you've got the opinions of multiple doctors that line up on either side, correct? Their findings, right. Right. Opinions, recommendations. You've got McCall, Tonino, and Levy that the commission hung their head on over Vasquez, Dr. Nam, and Dr. Rasch. Okay, so you got that. Then they made a reference to the claimant being less than credible. So what do we do with that? Well, I haven't really got that. What we have here, and I think this is apparent from the record, is a 51-year-old man who worked construction all his life, had no history of other injuries or claims, and he is in the midst of care that is not addressing all of his problems. You'll see where the employer initially authorizes care to the parts of the body that were most acutely injured at the time of the injury. Clearly, the broken left wrist, which required seven screws and a plate, serious fracture there. And the right shoulder and teeth, pretty clear, three teeth were gone. And it was kind of kept that way. So he starts complaining about, well, wait a minute, I'm in therapy now. It's a month or so, a couple of months after this injury, and I can't even do the therapy because, okay, sure, it was only prescribed for the left arm, but the therapists require my using the right, and now I'm noticing these problems in early January with these other parts of my body. I can't even do the therapy. He tries to make this clear to Dr. McCall. Again, only the care to the left wrist and the right shoulder were initially authorized. Dr. McCall sees he's not going to get paid for anything else. That scenario continues throughout the two therapy facilities that he goes to, and only with his beginning care with Dr. Vasquez, which he was able to choose on his own and get the proper attention to his concerns, do we begin to see light being shed on these other parts of his body. Well, when McCall testified, McCall's diagnosis found no causal connection between the disputed injuries and the work accident, correct? Dr. McCall. Right. That was not his opinion? He found no causal connection, I'm sorry, Judge. Between the disputed injuries and the work accident in his 2013 diagnosis. That's not correct. He probably made that finding, but it strains credulity to accept it, particularly when we see, again, nine years working for this company, doing heavy work with no physical problems whatsoever, no claims, nothing. And then when we start to see the attention being paid to his care that began with Dr. Vasquez and those other doctors to whom Dr. Vasquez referred the plan, we start to see everything else, including very significant findings on the cervical spine, encroachment onto the nerve root exits, on the spinal cord itself, and the surgical documentation for this sort of fake map to be installed. The exact term is in the brief. But I think getting back to your question, Your Honor, about the credibility, Mr. Pecor wasn't going to take it. What really did it for him is he's in therapy, and he's telling these folks, I can't do this. He's writing to Dr. McCall. He's virtually begging him, you're ignoring these other things. What does Dr. McCall say? Well, we'll get to that. Dr. McCall will even address the accepted, if you will, by the employer. Right shoulder, initially, he was all about the reduction of the left wrist fracture and installed on that as well. And after a point, Mr. Pecor couldn't take it any longer, and he hanged in there longer than he should have, apparently, but then started up his care with these other doctors. That's when everything comes to light. The FCE people weren't overly impressed with his subjective complaints and their clinical observations, were they? No question everybody's angry with everybody else. Everybody's frustrated. Mr. Pecor can't do what he's asked to do. They can't give him the care that he is asking for, that has been asking for, for conditions that, quite obviously, weren't there before this accident. And everybody's mad at everybody else, and he leaves. And he tries the other outfit, which is essentially the same problem, because the authorization for the care had not changed. He expected all his problems to be addressed, and they weren't. He didn't have them before this accident. They weren't addressed. So we got ourselves a cranky 51-year-old man, and I would imagine I would have felt the same way. He's fallen off the center. He's straining his head. He's breaking three, knocking three teeth out, and he's having a fracture of his left wrist. No other apparent cause. Multiple specific sites. I'm sorry, multiple unspecified, excuse me, sites of injury are right away referenced. That phrase is referenced in the emergency room records. My opponent will try to make much of the fact that, well, you know, the injury was on November 12th and wasn't until January 13th that the records contain a mention of partial body other than the left wrist and the right shoulder. Well, Mr. Pecor testified to having those problems right from the get-go. Of course, when we're talking about morphine and having medication while that wrist is healing, they didn't come to the fore. But, again, the ER just lumped them all in. Well, these guys got a lot of problems with them, and they didn't get into all the specifics. But that supports the proposition that they were there, maybe not delineated. And, you know, how many times do we see cases stand, fall, or better for worse, based on the entries that are initially made by intake clerks and so forth? In subpart D of your brief, where you speak of the failure to pay temporary benefits and the denial of additional compensation attorney fees being against the manifest weight of the evidence, manifest weight may very well be the standard of review for 19L, but it's not the standard of review for 19K or 16. 19K and 16 are judged under an abuse of discretion standard. Not just manifest weight. Well, but we have the reasonable and the standard of 19K. And once you start looking at things from that perspective, I would suggest that the facts come into play. Except for the commission doesn't have to award it even if they find the facts in your favor. It's totally discretionary on their part. That's what the statute says, may. It's a reasonable standard, though, so I'm not so sure I can't. Every case we've ever decided that 19K and 16 on standard of review is an abuse of discretion case. It says abuse of discretion is a standard of review, unlike 19L, which is purely a manifest weight question. Is that to say that when you say discretionary, that it's totally up to the commission to decide whether or not they want to award it? Unless it's an abuse of discretion. Okay, but the statute uses the word reasonable. It says may. May award is what the statute says. So an abuse of discretion is a fairly high hurdle. You have to show that the decision was arbitrary, reasonable, and no reasonable person would agree with that result, with that decision. Right. And, you know, I was the guy who argued continental discretion in 1983. If I recall correctly, that gentleman was delivering cases of liquor, and he had a broken arm. One of his arms was uncast. I've had a broken arm. I move stuff around my house with the cast on very carefully. It's pretty hard to do. But the commission used a reasonable standard in that case. I guess that's what the statute says. In order to award penalties, the commission must find that there is an unreasonable or vexatious delay. But the statute goes on to say that then the commission may award compensation. They've got to find unreasonableness before they award it. But they don't have to award it. Under 19L, 19L is a late payment. That's a manifest wait question. Every case on 19K and 16 say abuse of discretion is the standard of review. I understand, Your Honor, I was focusing on the reasonableness component of the statute, and that's where I was coming from on that. But I think the issue that really this case should really turn on is the lost time. First of all, Mr. P. Coronado is accredited for $42,000 because the lost time is voluntarily paid by the employer. But then we see the decision where lost time was called in May 2013 by decision of the commission. And that's where we get our biggest dispute really here. The dispositive inquiry is whether one has reached maximum medical improvement when it comes to entitlement to contemporary total disability benefits. We can look at whether he's released. We can look at the evidence concerning the injury. Well, what we, it's our contention, obviously, that he had not reached maximum medical improvement by that point in time. The commission decision reads that he was temporarily totally disabled when he refused to undergo the FCE. Well, we know from, I'm sorry, the reference was made to Dr. Levy's findings and Dr. Tonino, but a close reading of those findings, you'll see that McCall and Tonino, as well as Levy, do not find him to be at maximum medical improvement. They, there's some discussion about an FCE in a couple of those instances, but what's most glaringly apparent and just plain wrong is Dr. Levy's, the reliance by the commission on Dr. Levy's findings where we've got him saying, well, yeah, he clearly cannot work when Mr. Pecor first visited Dr. Levy in August 2013. And then a few months later, after undergoing therapy in November, the doctor says, I do not see any significant change with treatment. By the way, in therapy, and you don't get better, it logically dictates that something needs to be fixed, perhaps like the surgery that Dr. Leish ultimately determined was indicated here. In any event, then what does Dr. Levy do? He says, well, then he's at MMI. Well, the man hasn't gotten any better. He's got significant restrictions. He can't return to his regular job. How do we make that leap completely illogical? He was never, close reading of the record will show, he was never discharged to return to work by any of the doctors in this case. Does he have to be discharged to return to work in order to be found at MMI? The answer is no. Well, I, the problem, my hesitation is due to the fact that Section 8A deals with sort of two scenarios for care, and I'm not using medical in that because. . . Well, it certainly has an impact on your TTT argument. Okay, but we've got medical care contemplated by Section 8A. We also have care that's intended to relieve the effects of the injury. So in the first instance, medical care that's going to change in a positive way the patient's condition, but then something else later that will give them a greater comfort level. So it's a little hard to answer. Counsel, your time is up. You'll have time to reply. Okay, thank you. Counsel, you may respond. Thank you. If we could please support counsel Michelle Lafayette with Gannon and Trapero on behalf of Rosemont Expedition Services. The sole issue in this case is whether or not the commission's finding the left shoulder and the cervical spine is against the manifest way to the evidence, and there is ample evidence in this record to support the commission's decision on all of those issues, including the termination of temporary total disability benefits. The commission found the employee to be not credible, and they did so on a number of bases. The arbitrator and the commission have those bases listed in their decision. A lot of it goes to the dissatisfaction and the representations he made while treating an ATI from December to January of 2013. It has to do with Dr. McCall's observations. It has to do with his focus on disability since the get-go. It has to do with his focus on a representation he was not getting adequate care from the get-go, even though all these providers were addressing what his complaints were. Why does the commission believe or find that the claimant was less than credible? What specifically did they rely on to draw that conclusion? What did they rely on specifically? And why did they draw that conclusion? They were drawing that conclusion from the lack of evidence in the doctor's records that supported his testimony. Are there inconsistencies? There's inconsistencies. What McCall actually referenced is that he says he was on morphine at the emergency room. If you look at Dr. McCall's records, one of his complaints with the emergency room care is that they didn't give him any type of pain medication, which is belied by the emergency room records. He claims Dr. McCall is not documenting any of the complaints that he's coming into him with, but Dr. McCall is consistently documenting his conversations with him, and he's also consistently documenting all his observations that the clinical findings are inconsistent with his subjective complaints. There's a conversation with the therapist that Dr. McCall has where he notes that the therapist is noting those same inconsistent observations. The therapist is consistently noting those inconsistent observations. First at ATI, and then at Athletico. You're not talking about just one provider saying there's inconsistencies. You're talking about three providers at that point, Dr. McCall, ATI, and Athletico. And the reason for the change in therapy is that the petitioner is urging, and Dr. McCall pretty much said in his notes, let's try a different therapy facility and see if we have a different outcome, and you ended up with the same type of behavior ongoing. He says that was because he was having difficulty and they all got frustrated with him. But that's not what they're documenting. That's another inconsistency. They're documenting that he's not following their protocol. If you look at some of those notes, they even say he's not doing the home exercise program because he can't adequately document them. They're asking him to do another therapy modality, and he's refusing to do it, saying, I feel pretty good today. I shouldn't push myself any further. He really was focused on this disability and continuing the period of disability as opposed to the period of recovery. And the commission picks up on that. The arbitrator picks up on that, and they adapt that when they find him not credible. And you unfortunately can't see it in the record. I think some of it was also his overall demeanor. If you look at the record, there is some contentious back and forth, even on cross-examination with the questions that were being asked when they were challenging what he was testifying to and the inconsistencies that you saw in the record. Some of that does come through on paper, but when you really saw it in person, it was more evident at that point in time. I'd like to address the functional capacity evaluation only in the sense that the commission does look at his second refusal to undergo an FCE, as recommended by Dr. McCall, as the point at which they say enough is enough. We're going to cut off the temporary total disability benefits, and we're going to use this as the point of maximum medical improvement. The issue has gotten kind of muddied over the time because Counsel keeps referring to the W.B. Olson case, and he keeps saying that we're forcing him to undergo an FCE and we can't do that. That's not what's going on in this case, and I don't think W.B. Olson applies in the least here in what the commission did. W.B. Olson stood for the proposition that under Section 12 and 19C, the commission didn't have the authority to order a functional capacity evaluation. In this instance, Dr. McCall recommended an FCE not just once but twice. The first recommendation came in February when the therapist wanted some validity measurements to assess what his actual condition was. The claimant refused to undergo that FCE. The second FCE is recommended at the conclusion of care with Dr. McCall for two purposes. One is just to measure validity, and the second of which is to determine what is his work capacity. He actually goes to the functional capacity evaluation. The claimant just refuses to do it, and his reasoning is the most insightful as to what's going on here. He sees no benefit to it, to his undergoing that test. And the commission looks at that, and you can see it in their decision, and they say that's the point at which Dr. McCall has determined he's at maximum medical improvement. That's the point at which his entitlement to TTD ended. And that's also the point at which the treatment thereafter transitions to the two unrelated conditions. So it's a logical point, and it's a point that's supported by the manifest way to the evidence to terminate the respondent's temporary total disability liability. We would ask that this court find that the commission decision in its entirety, its credibility findings, its judgment that Dr. McCall, Dr. Tonino, Dr. Levy are more credible than Dr. Vasquez, Dr. Leisch, Dr. Naum, is supported by the manifest way to the evidence and affirm it on all points. Thank you. Thank you, counsel. Counsel, you may reply. Mr. D. Groves, it is within his rights to refuse to undergo this FCE test. And think about what these things are supposed to do. They're supposed to assess his capabilities. It's very akin to a Section 12 exam, really, if you think about it. It doesn't have to do with ñ it's not medical care. It's an evaluation. He had the right to refuse it, and he saw no benefit. I don't think any of us would when the therapy wasn't helping, when you still have to do your activities of daily living after you've tried the therapy, when the therapy that's being administered is limited to just one member, when we're talking about one human being, not just one member. I don't know what you mean. Yeah, I talked about it. I could have talked him into it, and I would have, because it was illogical. He had not gotten any better. Now, why is Olson not important here? Well, Olson says that FCEs are not mandatory here. Okay, well, there are problems with FCEs. And if this case stands, there's going to be an argument in all the cases coming up the pipe that if somebody doesn't go to an FCE, well, then they're now at MNI, and no more treatment should be rendered. Is that really all that McCall's opinion was based on, because he didn't go to the FCE? Didn't McCall conclude on May the 8th that there was a paupacy of findings on physical examination and imaging, and that six months post-injury, quote, we would expect much greater function, fewer complaints of discomfort. And he also wrote, I don't think any further intervention with injections or consideration for shoulder arthroscopies would be warranted. And claims that he discussed with the claimant that, quote, within the cervical spine is degenerative and not related to the fall. He recommends the FCE determine the capacity the plaintiff has for future work. He doesn't take the FCE. He doesn't do the FCE, so McCall can't make a determination of what he's capable of doing. And the commission turns around and says, wait a minute, based on all of this, and the fact that we don't believe the claimant, we think he's an MMI on May the 8th. There's a lot to address there, Your Honor. I'll try to. First of all, focusing on the FCE, counsel mentioned focusing on disability, that this was some wrong approach that Mr. Pecor was taking. He was focusing on his medical care. The FCE is what focuses on the extent of the disability and what the claim finally constitutes when everything is said and done. McCall anticipated a year of therapy initially, and then in May at the halfway mark decides at six months, oh, no, we're done with therapy. This was after Mr. Pecor, if you will, called him out, called out Dr. McCall. I mean, what about my other body parts? You said you'd get to them. They're interfering with my therapy. And that's when we got the findings that you just read, Your Honor. So the petitioner, Mr. Pecor, was not ready for determination of his disability. Certainly the insurance company was, and certainly Dr. McCall was. And all he does really is the surgery and orders some PT. If he felt he was competent to address Mr. Pecor's disability, he, as in the old days before FCEs, could have done so, but he didn't even choose to do that. But I don't think he can really have it both ways, Dr. McCall. Medical consistencies, I don't know, what, because they did give him drugs in the ER. Well, I guess the timing of that would be. These are all great arguments, but there's evidence in the other direction. Athletico and the other people in physical therapy don't think this guy is complying with the requirements. They don't think he's giving a maximum effort. McCall says, I can't equate any physical finding with the condition that you claim that you have. In six-month postpartum, we'd expect that you have greater function, fewer complaints of discomfort. Further intervention is not required. But look what McCall had. X-rays of the cervical spine. The big thing here, okay, of that non-approved treatment is the neck. McCall had X-rays of the neck. That's not going to show much. Degenerative findings in a 51-year-old man, short of course, of herniated discs, impinging on nerves and spinal cord, you're not going to see it on an X-ray. So those findings are not supportive of his position. They couldn't be, scientifically. Mr. Pecor had yet to reach maximum medical improvement at that point in time. He was interested in learning what necessary medical and surgical hospital services, as the act says, he should be getting here. His body was telling him that. And it made perfect sense. And when he finally gets those things, lo and behold, there are positive findings that supported all this cranky behavior and uncooperative behavior of Mr. Pecor. Counsel, your time is up. Thank you. Okay, thank you. Thank you, counsel, both, for your arguments in this matter. We'll take them under advisement. Interventive disposition shall issue. Court will stand in recess until 9 a.m. tomorrow morning.